UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Airline Professionals Association, Teamsters
Local Union 1224,

        Plaintiff,

   v.

ABX Air, Inc.,

        Defendant.

Case No. 1:07cv820

Judge Michael R. Barrett

ORDER

This matter is before the Court pursuant to the Preliminary Injunction filed by Plaintiff (Doc. 9) as well as the Motion to Dismiss filed by Defendant (Doc. 5). Responsive pleadings were filed and a hearing was held on November 26, 27 and 29, 2007. Both parties were present at the hearing and presented oral argument to the Court. This matter is now ripe for review. For the reasons set forth below, Defendant's Motion to Dismiss is Granted and the Court finds Plaintiffs' Motion for a Preliminary Injunction is Denied for lack of subject matter.

FACTS[1]

ABX Air, Inc. ("ABX") is a cargo services provider, and a "common carrier by air engaged in interstate or foreign commerce" subject to the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151, *et seq*. *See* 45 U.S.C. § 181. ABX currently employs approximately 650 pilots and professional flight engineers (collectively "crewmembers"). All of these crewmembers are represented by the Airline Professionals Association, Teamsters Local

---

[1] These facts include those allegations as set forth in the Complaint as well as those elicited during the Preliminary Injunction hearing.

Union 1224, affiliated with the International Brotherhood of Teamsters - Airline Division ("Union"). ABX and the Union have entered into a series of collective bargaining agreements, dating back to 1983, setting forth various terms and conditions of its crewmembers' employment. The current CBA was signed on August 14, 2003, and became amendable on August 1, 2006. The parties have been negotiating for a successor agreement since the Union filed a "Section 6 Notice" on ABX on August 24, 2006.

In 2006, ABX entered into discussions with All Nippon Airways Co. ("ANA"), a Japanese airline, regarding a potential business relationship between the two airlines. The proposed transaction involved the lease of ABX aircraft to ANA to support ANA's cargo operations throughout Asia, including Japan, China and Thailand. In addition to supplying the aircraft, ABX would also provide crewmembers to operate the aircraft and be responsible for the maintenance and insurance of the aircraft. In September 2006, ABX informed the Union about the possibility of a transaction with ANA, and told the Union that it would have to open a new domicile in Japan at some point. In January, 2007, ABX informed the Union of its intent to open a new domicile. On January 26, 2007, the Union filed a second Section 6 notice concerning the effects of bargaining related to the ANA flying. Negotiations commenced between the parties and on April 23, 2007, the parties reached a tentative agreement regarding the terms and conditions of a side letter covering the ANA flying. At that point, the intent to open a domicile was tabled, or at least put on hold. The parties did not, however, reach an agreement regarding the remainder of the CBA.

ABX contends that despite achieving a tentative agreement on the ANA flying, the Union refused to submit the ANA Side Letter to the Local 1224 members for a ratification

2

vote. The Union contends that it had agreed with Joseph Hete, President and CEO of ABX, that once the Successor CBA negotiations were completed that it would submit both the Successor CBA and the side letter to the members for ratification.

Several issues arose regarding scheduling and other logistical matters related to the ANA flying. The parties continued to negotiate and finally came to an agreement that was memorialized in a side letter, known as the Gray letter. The Gray letter was, by its terms, to remain in effect pending the ratification of the ANA Side letter.[2]

In June 2007, ABX informed the Union that it would initiate the ANA operations in and its intent to open a domicile in Japan as of October 1, 2007. After a series of discussions, ABX retracted its announcement to open the domicile, however, the ANA operations continued to operated under the terms of the Gray letter.

On September 14, 2007, ABX again announced its intent to open a Japan domicile as of December 1, 2007 and distributed a letter to crewmembers setting forth the terms and conditions of employment in Japan. The Union contends that these terms and conditions significantly alter the rules, rates of pay, and working conditions as set forth in the CBA. ABX posted for bid several proffers for positions in the Japan domicile on September 17, 2007. The Company simultaneously sent recall notices to furloughed crewmembers for these positions. The Union then filed this lawsuit on October 2, 2007 claiming the Company's actions of opening the new domicile without concluding a final agreement with

---

[2]The evidence indicates that throughout the course of the parties' dealings, side letters (also known as "side agreements") were not uncommon. Typically side letters were attached to the CBA. However, on occasion, interim operations were conducted via side letters not attached to the CBA, such as the Gray letter. These side letters often covered operational issues until a final accord could be reached.

the Union over the effects of that decision violated the RLA's status quo provisions.

Article XIV of the CBA addresses the establishment of new domiciles. It provides, in pertinent part, that if ABX decides to open a new domicile, it "will notify the Union of its decision as soon as possible." In addition, if the new domicile is to be located outside the contiguous United States, then either ABX or the Union may institute negotiations pursuant to Section 6 of the RLA (without regard to the CBA's amendable date) for the purpose of negotiating matters related directly and solely to the opening of a new domicile and to "determine the changes necessary in this Article to facilitate such a move." Plaintiffs' Exhibit 1, Art. XIV, Sec. A and F.

A version of Article XIV has existed in all of the parties' CBAs, going back to the first contract in 1983. In the 1987 CBA, the one in force immediately prior to the 1992 CBA, the final sentence of Article XIV, Section A read: "Such negotiations shall not alter, amend, or modify any of the existing provisions of the basic agreement except those provisions directly and solely related to the opening of the new domicile, and shall not delay the opening of the new domicile." See Defendant's Exhibits 1 and 2. However, that phrase was not included in the 1992 CBA. Defendant's argued that there was never any intention by the parties' to remove the 1987 language from Article XIV, Section A and that the omission of this language in 1992 was simply a scrivener's error, not an intentional deletion. In support, the Defendant's presented Defendant's Exhibit 6 which includes all of the parties' proposals regarding Article XIV and indicates that the proposals contained the disputed language, as did the parties' final, tentative agreement.

However, Plaintiff's argue, and the Court agrees, that it was not a scrivener's error. Plaintiff presented testimony from Mr. Ziebarth that on May 28, 1992 the language was

4

changed, through negotiations, to incorporate Section F into Section A of Article XIV. Defendant's then presented the testimony of Mr. Gibbons and his hand written notes. See Defendant's Exhibit 50. Mr. Gibbons testified that outside of his notes he had no independent recollection of the events in question. However, his testimony and notes coincide with that of Mr. Ziebarth's testimony. Gibbons' notes indicate that although there was a tentative agreement signed off between the parties on April 22, 1992, negotiations continued thereafter. His session No. 65 notes of April 22, 1992 do not indicate the status of international operations which would later become incorporated as Article XXIII. Mr. Zeibarth's testimony was that the international operations piece necessitated further modifications to the document and to Article XIV. Gibbons' Session 69, May 20, 1992 notes show a reference to international pay and interest arbitration. Article XXIII, as finally written, provides for interest arbitration on international pay. Gibbons' Session 73, May 28, 1992 notes reference international pay and Article XXIII and shows that Article XIV was placed on "hold" confirming Mr. Ziebarth's testimony that the negotiations were not concluded on April 22, 1992 and that Article XIV remained in play. One can only rationally conclude that the language contained in the final 1992 Agreement was negotiated and agreed upon and not a scrivener's error. Mr. Gibbons' lack of detail regarding these two Articles could well be the result of the opinion expressed by other company witnesses that ABX was not considering international operations or domicile in 1992. Regardless, the same Article XIV, Section A language of the 1992 CBA Agreement remained in the 1997 and 2003 Agreements. While much time was spent on the scrivener's error theory of defense, which the Court discards, the real issue for the Court is whether the Company's position with the language as written, is arguably justified. The Court finds that it is.

LAW AND ANALYSIS

    1.    Motion to Dismiss

The Court will first address Defendant's Motion to Dismiss. A motion to dismiss pursuant to Rule 12 (b)(6) operates to test the sufficiency of the complaint. The court is required to construe the complaint in the light most favorable to the Plaintiff, and accept all well-pleaded factual allegations in the complaint as true. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) and *Lewis v. ACB Business Services*, 135 F.3d 389, 405 (6th Cir. 1998). A court, however, will not accept conclusions of law or unwarranted inferences which are presented as factual allegations. *Blackburn v. Fisk University*, 443 F.2d 121, 124 (6th Cir. 1974). A complaint must contain either direct or reasonable inferential allegations that support all material elements necessary to sustain a recovery under some viable legal theory. *Lewis v. ACB*, 135 F.3d at 405 (internal citations omitted). As the Supreme Court recently held in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, (May 21, 2007), a complaint must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974 (rejecting the traditional 12(b)(6) standard set forth in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). To survive a motion to dismiss, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* at 1965. "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 1969.

A court has the authority to dismiss a plaintiff's complaint if the plaintiff is unable to prove that the court has jurisdiction over its claims. *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915-16 (6th Cir. 1986). ABX's motion presents a factual attack on the Union's

assertion that the Court has subject matter jurisdiction. Thus, the Court has the discretion to make all necessary factual determinations required to reach the jurisdictional issue presented, and may consider all evidence presented by the parties. Moreover, the Union has the burden of proving jurisdiction. *See Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990) (under 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the plaintiff has the burden of proof). *See also Bell Atlantic Corp., et al. v. Twombly*, 127 S. Ct. 1955, 1966 (2007) ("[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'") (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure, § 1216, at 233-34 (3d ed. 2004)).

One of the primary purposes of the Railway Labor Act ("RLA"), as stated in the statute itself, is "[t]o avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152, *see also Airline Professionals Ass'n, Teamster Local Union 1224 v. ABX Air, Inc.*, 400 F.3d 411, 413 (6th Cir. 2005) ("*ABX II*"). To accomplish that purpose, the RLA provides two primary mandatory procedures for resolving disputes between carriers and unions. Which procedure applies depends on the nature of whether the dispute is classified as "major" or "minor" – terms that do not relate to the importance of the dispute, but its source. *Id.* at 414; *Airline Professionals Ass'n, of the Int'l Bhd. of Teamsters, Local Union 1224 v. ABX Air, Inc.*, 274 F.3d 1023, 1028 (6th Cir. 2001) ("*ABX I*"). A "major dispute" is a dispute concerning the establishment of a CBA, or efforts to modify a CBA through negotiations. As the Supreme Court has stated, major disputes involve "the formation of collective bargaining

7

agreements or efforts to secure them. They arise when there is no such agreement or where it is sought to change the terms of one, and therefore the issue is whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to the assertion of rights claimed to have vested in the past." *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945). S*ee also ABX II*, 400 F.3d at 414. A "minor dispute," on the other hand, is a dispute arising out of the interpretation of an existing CBA. *ABX II*, 400 F.3d at 414. Minor disputes contemplate the existence of a CBA already concluded or a situation in which no effort is being made to bring about a formal change in terms or to create a new CBA. *Burley*, 325 U.S. at 723. "The claim is to rights accrued, not merely to have ones created in the future." *Id.*

In short, the difference between the two is that "[m]ajor disputes seek to create contractual rights, minor disputes to enforce them." *Consolidated Rail v. Railway Labor Exec. Ass'n,* 491 U.S. 299, 302 (1989)("*Conrail*"). The distinction between "major" and "minor" categories has distinctive procedural implications. *ABX I*, 274 F.3d at 1028. In the major dispute context, the "RLA mandates a lengthy process of negotiation and mediation before either party may resort to self-help." *ABX I*, 274 F.3d at 1028 (citing *Conrail*, 491 U.S. at 302-03). During that process, the parties must maintain the "status quo" with respect to rates of pay, rules, and working conditions (*see* 45 U.S.C. § 152, Seventh, 45 U.S.C. § 156), and the "district courts have subject matter jurisdiction to enjoin a violation of the statute quo pending the exhaustion of the required procedural remedies." *ABX II*, 400 F.3d at 414 (citing *Conrail*, 491 U.S. at 303). Minor disputes, in contrast, are "subject to compulsory and binding arbitration" before the System Board of Adjustment created by the parties in their labor contract. *ABX I*, 274 F.3d at 1028; 45 U.S.C. § 184. The System

Board's jurisdiction over minor disputes is exclusive, with only limited judicial review available after an award has been issued. *ABX I*, 274 F.3d at 1028. Moreover, "there is no requirement that the parties maintain the status quo pending board resolution of the [minor] dispute." *ABX I*, 274 F.3d at 1028.

There is a strong presumption that a dispute between parties to an RLA agreement is minor. *See, e.g., Railway Labor Executives Ass'n v. Norfolk & W. Ry. Co.*, 833 F.2d 700, 705 (7th Cir. 1987) ("because a major dispute can escalate into a strike, if there is any doubt as to whether a dispute is major or minor a court will construe the dispute to be minor"). As the Supreme Court stated in *Conrail*, if the employer's claim that the CBA gives it the right to make a particular change is "arguably justified by the terms of the parties' agreement (*i.e.*, the claim is neither obviously insubstantial or frivolous, nor made in bad faith), the employer may make the change and the courts must defer to the arbitral jurisdiction of the [Adjustment] Board." 491 U.S. at 310. *See also CSX Transp., Inc. v. United Transp. Union*, 395 F.3d 365, 369 (6th Cir. 2005) (holding that if the Company's interpretation of the contract is "arguably justified, then the issue should be resolved under the RLA's procedures for minor disputes"); *United Transp. Union v. River Terminal Ry. Co.*, 1998 U.S. App. LEXIS 6647, *9-10 (6th Cir. 1998) ("If an employer's action is 'arguably justified' by the terms of the collective bargaining agreement, or its reliance on the labor contract is not 'obviously insubstantial' or 'frivolous,' the controversy is a minor dispute within the meaning of the RLA . . . ."). Thus, the carrier's burden in this regard is a "relatively light" one. *Id.* at 308; *Int'l Bhd. Of Teamsters v. UPS Co.*, 447 F.3d 491, 499 (6th Cir. 2006). *See also ABX II*, 400 F.3d at 414 (the carrier's burden of demonstrating that a case involves a minor dispute "is not heavy"). A court may not delve into (much less

9

determine) which party's interpretation of the CBA is correct; once it determines that the carrier's position is "arguably justified" or "not obviously insubstantial," its role is done and the case must be dismissed for want of subject matter jurisdiction. *Division No. 1, Detroit, Brotherhood of Locomotive Engineers v. Consolidated Rail Corporation*, 844 F.2d 1218, 1221 (6th Cir. 1988) (district court erred by determining whether the company's interpretation of the labor agreement was correct rather than examining whether it was arguably justified).

The union has argued that they specifically bargained out prior language of the 1987 contract wherein Article XIV said in part, "the negotiations surrounding a new domicile, 'shall not delay the opening of the new domicile'". Although the Court has rejected the scrivener's error argument, it cannot say that the recent action taken by the Company was not arguably justified under the terms of the contract as presently written. This Court cannot say that the employer's action were taken in bad faith or frivolous and must therefore defer to arbitrational jurisdiction. *Airline Professionals Ass'n of Intern. Broth. Of Teamsters, Local Union No. 1224, AFL-CIO v. ABX, Air*, 274 F.3d 1023 (6th Cir. 2001); *Association of Flight Attendants, AFL-CIO v. United Airlines, Inc.*, 976 F.2d 102 (2nd Cir. 1992).

Thus, this case involves a minor dispute in that it is arguably justified that the CBA gives ABX the right to open a new domicile prior to concluding negotiations with the Union. It is not "obviously insubstantial," "frivolous," or made in "bad faith." *Conrail*, 491 U.S. at 310. The language of the CBA specifically provides for the opening of a new domicile. See Article XIV, Section A. The Court finds that the staffing of this new domicile is provided for in Article XIV, Section F wherein it states that "Should the Company open a domicile

outside the contiguous United States, the Company and Union will meet to determine the changes necessary in this Article to facilitate such a move." It is arguably justified for the employer to interpret the "will meet to determine the changes necessary ... to facilitate such a move" to mean that the Union and employer will meet to determine the changes necessary to make the move easier for the crewmembers, not necessarily that they had to meet and agree on the changes necessary before a move can occur.

    2.    Motion for Preliminary Injunction

The Court finds that it does not have jurisdiction to consider the motion for preliminary injunction. This matter is hereby DISMISSED.

**IT IS SO ORDERED**.

/s/Michael R. Barrett  
Judge Michael R. Barrett